## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THE HARVARD DRUG GROUP, LLC**<br>**31778 Enterprise Drive**<br>**Livonia, MI 48150,** : | **CIVIL ACTION NO. _____** |
| : | |
| **Plaintiff,** : | **CLASS ACTION COMPLAINT** |
| : | |
| **v.** : | **JURY TRIAL DEMANDED** |
| : | |
| **ASTRAZENECA PHARMACEUTICALS**<br>**L.P.; ASTRAZENECA L.P.; ZENECA, INC.;**<br>**and ZENECA HOLDINGS, INC.,** : | |
| : | |
| **Defendants.** : | |

Plaintiff The Harvard Drug Group ("Plaintiff"), by and through its undersigned attorneys, hereby brings this action on behalf of itself and the class defined below under the United States antitrust laws against Defendants AstraZeneca Pharmaceuticals L.P., AstraZeneca L.P., Zeneca, Inc., and Zeneca Holdings, Inc. (collectively, "AstraZeneca" or "Defendants") and demand a jury trial:

### NATURE OF THE ACTION

1.      This class action seeks treble damages for Defendants' unlawful monopolization of the market for omeprazole and esomeprazole drugs, the active ingredients in the drugs Prilosec and Nexium. These drugs are taken to prevent heartburn and to heal damage to the esophagus that can result from acid reflux. Defendants orchestrated an anticompetitive scheme to preserve and extend their monopoly power in the market for these drugs by harming generic competition. Defendants' unlawful conduct has deprived Plaintiff and others similarly

1

situated of the benefits of effective generic competition from at least December, 2002 through the present.

2.      Prilosec was patented in 1981 and is manufactured by Defendants. By 1999, sales of Prilosec exceeded $4 billion, making it the top-selling drug in the world. As described more fully below, faced with the prospect of Prilosec coming off patent in 2001 and facing generic competition, Defendants developed a new pill, Nexium, which was only slightly different chemically from Prilosec but did not work any better. (It was, however, patented and therefore protected from generic competition.) As the discoverer of the underlying mechanism in both Prilosec and Nexium, Dr. George Sachs, stated, once the ingredients in Prilosec and Nexium are activated "they are the identical molecule."

3.      Defendants planned and carried out a series of anticompetitive acts with the purpose and effect of eliminating generic competition, including engaging in a campaign of deception regarding the alleged benefits of Nexium over Prilosec and limiting the supply of unpatented Prilosec in order to force the purchase of patented Nexium. These actions served to protect and extend Defendants' monopoly in a manner not attributable either to the superiority of Nexium or to the acumen of its makers and were therefore anticompetitive and violations of section 2 of the Sherman Act.

4.      Plaintiff brings this action on behalf of itself and a class of direct purchasers of branded omeprazole/esomeprazole drugs. Defendants' anticompetitive acts allowed them to charge supracompetitive prices for branded omeprazole/esomeprazole, causing Plaintiff and members of the class to pay overcharges on their purchases.

**PARTIES**

2

5.      Plaintiff The Harvard Drug Group, LLC ("Plaintiff" or "Harvard Drug") is a corporation organized under the laws of Michigan, with its principal place of business in Livonia, Michigan.  Plaintiff, during the Class Period, as defined below, purchased the drugs at issue directly from one or more Defendants.

6.      Defendant AstraZeneca Pharmaceuticals L.P. is a Delaware limited partnership with its principal place of business in Wilmington, Delaware.  AstraZeneca Pharmaceuticals L.P. is owned and controlled by AstraZeneca PLC, a public limited liability company domiciled in the United Kingdom.

7.      Defendant AstraZeneca L.P. is a Delaware limited partnership with its principal place of business in Wilmington, Delaware.

8.      Defendant Zeneca, Inc. is a Delaware corporation with its principal place of business in Wilmington, Delaware.

9.      Defendant Zeneca Holdings, Inc. is a Delaware corporation with its principal place of business in Wilmington, Delaware.

10.     The Defendants identified above will be referred to collectively as "Defendants" or "AstraZeneca."

## JURISDICTION AND VENUE

11.     This Complaint brings a civil antitrust claim arising under section 2 of the Sherman Act, 15 U.S.C. § 2, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  The Court has subject-matter jurisdiction over the claim pursuant to 28 U.S.C. §§ 1331 and 1337.

12.     Venue is proper in this Court pursuant to section 12 of the Clayton Act, 15

3

U.S.C. § 22, and 28 U.S.C. § 1391, because each Defendant is an inhabitant of this District or is found or transacts business here.

## TRADE AND COMMERCE

13.    The pharmaceutical products at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, interstate commerce.

## ECONOMIC CHARACTERISTICS OF PHARMACEUTICAL MARKETS

14.    The pharmaceutical industry is oriented, to a great extent, around the development and monetization of intellectual property.  Manufacturers of branded pharmaceuticals devote considerable resources to developing, patenting, testing, gaining regulatory approval for, and then ultimately bringing to market new products.  The incentive for this effort is the substantial profits that await commercially successful pharmaceutical products.

15.    One of the main reasons behind that substantial profit is the legal protection from competition granted to new products.  This protection takes several forms. Often, the developers of new products are able to acquire patents covering the compound itself, the manufacturing process, or the compound's application.  Moreover, the FDA has the ability to grant patent extensions (beyond the life of the applicable patents) in recognition of the fact that a substantial amount of patent life may be expended in obtaining the necessary approvals to bring the product to market.

16.    In addition to patent protection, the FDA is not permitted to accept an application for a generic version of a drug containing a "'new chemical entity' (i.e., an active ingredient for which the FDA has never before granted marketing approval)" until at least five

years after its approval. Moreover, the technical risks of R&D, as well as the time and resource-intensive process of bringing new products to market, are themselves barriers to entry that afford competitive protection to those who succeed.

17.    Branded pharmaceuticals are grouped into therapeutic categories based on the medical indications for which they are approved. In today's health care system, choices among branded products within a given therapeutic category result from a complicated interaction involving physicians, patients, and, in some circumstances, health care management companies. The value of the monopoly that is conveyed with the approval of a new drug depends, of course, upon how often doctors prescribe it. Hence, branded pharmaceutical companies devote considerable effort to increasing the frequency with which doctors prescribe their products. These efforts take a variety of forms, including visits to physicians by sales representatives, free samples, advertising, sponsored studies, etc. Branded product sellers use large sales and marketing forces to influence physicians and health care managers.

18.    Insofar as the physician can choose among a group of products approved for the same indications, there is rivalry on the part of pharmaceutical sellers for physician patronage. The brand company works to persuade physicians to prescribe its product instead of other products within a particular therapeutic category--a process referred to as "brand differentiation." Sellers of those other products are working to persuade physicians in the opposite direction. Companies engaged in this process often refer to their rival pharmaceutical developers as "competitors" or discuss brand differentiation under the heading of "competitive strategies" or something similar.

19.    This rivalry is not price competition. The objective of brand

differentiation is to persuade physicians that the product is different and better than other alternatives, in effect reducing the degree of therapeutic substitutability that physicians may associate with products in the same therapeutic class. Successful brand differentiation limits price competition creating and enhancing monopoly power. Price competition, on the other hand, produces lower prices and enhances consumer choice.

20.     Indeed, brand differentiation is not generally about price. First of all, insofar as monopoly power and the associated ability to profitably maintain higher prices are the goals of brand differentiation, it would be counter-productive to compete vigorously on price at the same time. More than that, however, physicians' prescription choices are not generally sensitive to price. Hence, price cuts are not an economic (or particularly effective) way to induce growth in prescriptions. The overriding objective is product differentiation, i.e., to create a market perception of uniqueness and lack of substitutability with other products in the category, thereby reinforcing and enhancing the market power associated with the approval and introduction of the brand in the first place.

21.     The monopoly power that this system creates for branded pharmaceutical products is extensive. The revenues, margins, and profits of branded monopolies are such that a few flagship products—so called "blockbuster drugs"—create billions in market capitalization for their manufacturers.

## THE ECONOMIC RATIONALE FOR GENERIC SUBSTITUTION LAWS

22.     Congress sought to ameliorate the price disconnect in pharmaceutical markets, and restore some normal competitive pressures to those markets, by making it easier to manufacture and sell of generic pharmaceuticals. State legislatures continued this policy by

mandating or permitting generic substitution by pharmacists without physician approval. When a pharmacist receives a prescription for a branded pharmaceutical product, and a generic version of that product is available, state law permits (and in some cases requires) the pharmacist to dispense the generic product instead of the branded product. In this way, the importance of price is reintroduced to the product selection decision at the pharmacy counter. When generic versions of a brand-name drug become available, the branded manufacturer loses its ability to exploit the market imperfection, its monopoly power dissipates, and some normal competitive pressures are restored.

23.    Today, all 50 states have Drug Product Selection ("DPS") laws that permit or require a pharmacist to dispense a generic drug in lieu of a brand drug whenever possible. These DPS laws are premised on the economic fact that brand companies exploit the market defect by promoting to doctors and that generic firms are unable to do so and therefore promote their products by offering low prices to pharmacies:

> Since physicians are an unlikely force behind a switch to lower-cost brands after the patent period has expired, an erosion of the patent-conferred monopoly must depend on others who have both the power and the incentive to respond to lower prices. That is the role envisioned for the drug product selection laws: to transfer some of this power to pharmacists. Consumers are the ones most interested in a lower price, and pharmacists must respond to consumer demand because of direct competition with other pharmacies on prescription prices.

Generic Substitution at 7.

24.    DPS laws "shift the choice of [drug product] for most prescriptions from the physician to the pharmacist." *Id.* As the FTC Report put it, "the laws foster price competition by allowing the only principals who have financial incentives to make price

comparisons – the pharmacist and the patient – to select drug products on the basis of price."
FTC Staff Rep. at 7.

## STATE AND FEDERAL PROMOTION OF GENERIC ENTRY

25.     Based on this economic rationale, it became State and national policy to encourage generic substitution for branded drugs. Working together, the Federal Trade Commission ("FTC") and the Food & Drug Administration ("FDA") in 1979 developed a Model Drug Product Selection Act ("Model Act") for State legislatures to enact. *See* FTC Staff Rep. at 273. The Model Act permits pharmacists to dispense a generic unless the doctor specifies that the brand is medically necessary. The FTC and FDA were "committed to facilitating drug product selection [*i.e.*, generic substitution]," and believed "that effective drug product selection laws will work to stimulate price competition in a multi-source prescription drug market." *Id.* at 291.

26.     The FDA also helped promote generic substitution by developing a list of therapeutically equivalent, generic drugs that could be safely substituted for branded products (today called the "Orange Book," because of its color). The purpose of the FDA's list was to "enhance the ability of drug purchasers to recognize and take advantage of opportunities for direct savings by drug selection." Rules and Regulations, Dept. of Health and Human Services, Food and Drug Admin., Therapeutically Equivalent Drugs; Availability of List, 45 F.R. 72582 (Oct. 31, 1980) at 41. This list helps make drug products "sufficiently interchangeable so that price can be a major factor in their selection." Office of Technology Assessment, Drug Bioequivalents, at 57 (July, 1974).

27.     The first generic competitor to enter a market typically does so at a price at

8

least 30% lower than the price of the equivalent brand-name drug and quickly takes a substantial amount of market share away from the brand-name manufacturer. As additional generic competitors come to market, the price of the generics continues to fall, and their combined market share continues to grow. In many cases, generic competitors sell products equivalent to brand-name prescription drugs for as little as 10% of the price of the brand-name drug, and have captured as much as 90% of the brand-name drug's pre-generic sales.

28.     The price competition engendered by generic pharmaceuticals benefits all purchasers of the drug, at all levels of the distribution chain, who are able to buy the same chemical substance at much lower prices.

## FEDERAL REGULATION OF NEW PHARMACEUTICAL PRODUCTS

29.     The federal administrative efforts to encourage generic substitution were ratified by Congress in 1984 with the enactment of the Hatch-Waxman Act. As discussed below, that Act speeded generic entry by easing the FDA approval process.

30.     Under the federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, approval by the FDA is required before a new drug may be sold in interstate commerce. Premarket approval for a new drug must be sought by filing a new drug application with the FDA, under either section 355(b) or section 355(j) of the Act, demonstrating that the drug is safe and effective for its intended use.

31.     In 1984, Congress amended the Food, Drug and Cosmetic Act by enacting the Drug Price Competition and Patent Term Restoration Act, commonly known as the Hatch-Waxman Act. The Hatch-Waxman Act simplified the regulatory hurdles for prospective generic drug manufacturers by eliminating the need for generic firms to file lengthy and costly New Drug

9

Applications ("NDAs") in order to obtain FDA approval. Instead, such firms are permitted to file Abbreviated New Drug Applications ("ANDAs") and to rely on the safety and efficacy data already supplied to the FDA by the brand-name manufacturer. The Hatch-Waxman Act also added a number of patent-related provisions to the statutory scheme, as described below. Congress's principal purpose in enacting the Hatch-Waxman Act was "to bring generic drugs onto the market as rapidly as possible." *Mova Pharmaceuticals Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998).

32.     New drugs that are approved for sale by the FDA are sometimes protected by a patent or patents, which provide the patentee with the (conditional) exclusive right to sell that drug in the United States for the duration of the patentee or patents involved, plus any extensions. Under 21 U.S.C. § 355(b)(1), a patentee seeking FDA approval for a new drug is required to file with the FDA the patent number and expiration date of any patents that claim the drug for which the applicant seeks approval.

33.     An applicant filing an ANDA for a generic version of a brand-name drug must certify to the FDA that one of the following conditions is satisfied: (1) the brand-name manufacturer has not filed patent information with the FDA (a "paragraph I certification"); (2) the patent or patents have expired (a "paragraph II certification"); (3) the patent will expire on a particular future date, and the generic manufacturer does not seek to market its generic product before that date (a "paragraph III certification"); or (4) the patent is invalid and/or will not be infringed by the generic manufacturer's product (a "paragraph IV certification"). 21 U.S.C. § 355(j)(2)(A)(vii).

34.     If a generic manufacturer submits a paragraph IV certification stating that

a listed patent is invalid or will not be infringed, it must notify the patentee of the filing and explain why the patent is invalid or will not be infringed.  21 U.S.C. § 355(j)(2)(A)(vii)(IV).

35.     The patentee, upon receiving a paragraph IV certification from an ANDA applicant, has 45 days in which to initiate a patent infringement action against the applicant (a cause of action created by the Hatch-Waxman Act).  If no action is initiated within 45 days, FDA approval of the generic proceeds without regard to patent issues.  If a patent infringement lawsuit is brought within the 45-day window, however, the FDA is automatically barred from granting final approval to the generic applicant until 30 months after the patentee's receipt of the paragraph IV certification, unless the patent expires or is held invalid or noninfringed first.  21 U.S.C. § 355(j)(5)(B)(iii).  This automatic stay of FDA approval is triggered without regard to the merits of the patentee's lawsuit.

36.     The Hatch-Waxman Act and the federal regulations that implement it do not give the FDA authority to resolve issues of patent law.  The FDA is required to accept as true information it obtains from patentees and to withhold its approval of new generic drugs whenever the patentee presents a litigated dispute (whether genuine or not) regarding the validity or infringement of a patent.

37.     One result of the statutory and regulatory provisions described above is that brand-name manufacturers have a strong incentive to obtain, list, and enforce patents against prospective generic applicants even if the patent is ultimately held to be invalid or not infringed by the generic drug.  If a brand-name manufacturer is able to obtain a patent from the Patent and Trademark Office, list the patent in the Orange Book, and bring actions under the Hatch-Waxman Act to enforce the patent, the brand-name manufacturer can effectively block the entry

11

of generic competition for up to 30 months, and possibly longer. This delay, which is triggered without regard to the merit of the patentee's claim, can be worth hundreds of millions of dollars to the manufacturer of a successful brand-name drug.

38.    FDA regulations also provide a second means for an unscrupulous brand manufacturer to impair generic competition. Under the Hatch-Waxman Act and State regulatory regimes, described above, only generic drugs that have been "AB-rated" by the FDA may be automatically dispensed by the pharmacist in lieu of the brand drug. In order to receive an AB-rating, a generic drug must be: (1) therapeutically equivalent to its brand name counterpart, meaning that the generic has the same active ingredient, form, dosage, strength, and safety and efficacy profile, and (2) bioequivalent to its brand name counterpart, meaning that the generic is absorbed in the body at approximately the same rate as is the branded drug.

39.    An unscrupulous brand manufacturer that expects to experience generic competition for its original product coming off patent (Product A) can stop promoting that product and promote instead a virtually identical but patented product (Product B), including by false and misleading means. To the extent it is successful, such a scheme will significantly impair the ability of a generic version of Product A to compete, because most physicians – in response to the brand manufacturer's detailing efforts – will stop writing prescriptions for Product A and the approved generic product will not be substitutable for Product B. Thus, the brand manufacturer will effectively protect its monopoly profits from generic competition in a manner not attributable either to the superiority of its product or to the acumen of its maker. In order to compete, the generic firm must start over and submit a new ANDA seeking approval to market a generic version of Product B, which will add at least several years to the FDA approval

process.

40.    As shown in detail below, Defendants were successful in developing and marketing Nexium through precisely this kind of anticompetitive scheme. Nexium was not a medical improvement over Prilosec; it was a slight chemical variant of Prilosec (one-half of the Prilosec molecule). Defendants knew, based on the economics of the pharmaceutical industry and the AB-rating system, that switching the market from Prilosec to Nexium through anticompetitive means, including a deceptive publication strategy, a deceptive detailing strategy with doctors, and a deceptive direct-to-consumer advertising program, would substantially impair competition by generic producers of Prilosec and allow Defendants to maintain their monopoly, in violation of the antitrust laws.

## OMEPRAZOLE AND ESOMEPRAZOLE

41.    Prilosec is one of a class of drugs referred to as "proton pump inhibitors," which are used to treat heartburn and related conditions. The active ingredient in Prilosec is omeprazole. By 1999, AstraZeneca's sales of Prilosec in the United States exceeded $4 billion, making it the top-selling drug in the world.

42.    AstraZeneca owned a patent on omeprazole that was issued by the United States Patent and Trademark Office ("PTO") in March of 1981 and, after various extensions, expired in October, 2001. Defendants (or their affiliates) obtained and listed in the Orange Book more than a dozen other patents related to omeprazole. As of October of 2001, however, the active pharmaceutical ingredient in Prilosec was unpatented, leaving Prilosec vulnerable to generic firms that could attempt to invalidate or "design around" the other patents.

43.    Omeprazole is a "racemate," a substance consisting of equal parts of two

different physical forms (or isomers) of the same molecule. The two physical forms are mirror images of one another but are otherwise identical. Each form is referred to as an "enantiomer." Esomeprazole is the left-handed or "S" (for "sinister," the Latin word for "left handed") enantiomer of omeprazole. Thus, omeprazole consists of equal parts of the right- and left-handed forms of the molecule, while esomeprazole is the left-handed form.

44.     The FDA approved 20 mg Prilosec capsules in September of 1989, 10 mg capsules in October of 1995, and 40 mg capsules in January of 1998. AstraZeneca began marketing each strength of the drug shortly after receiving FDA approval. From September, 1989 until December, 2002, AstraZeneca was the only manufacturer of prescription drugs containing omeprazole (or any enantiomer of omeprazole) in the United States.

## DEFENDANTS' EXCLUSIONARY SCHEME
## TO HARM GENERIC COMPETITION

45.     AstraZeneca was aware that its best-selling drug would become vulnerable to generic competition in 2001 and, during the mid-1990's, began devising ways to delay or impair generic competition. AstraZeneca convened a group of marketers, lawyers, and scientists and charged them with finding a solution to the impending patent expiration of the company's best-selling drug. The group called itself the "Shark Fin Project," after the shape that the Prilosec sales chart would trace if Prilosec faced unimpaired generic competition: an inverted V.

46.     The scheme devised by the Shark Fin Project was multifaceted. First, before the onset of generic competition, AstraZeneca would seek and obtain FDA approval for a drug containing esomeprazole as its active ingredient, which, because it used a slightly different form of the molecule, would not be AB-rated to (and thus not subject to substitution by) generic

versions of Prilosec. Second, AstraZeneca would engage in an enormously expensive detailing and advertising campaign, using false, deceptive, and misleading claims, to switch existing Prilosec prescriptions to its branded esomeprazole drug (Nexium) and thereby protect those prescriptions from generic substitution. Third, AstraZeneca would effectively withdraw branded Prilosec from the market, cause managed care organizations not to cover the costs of generic Prilosec, and thus drive patients to the much higher-priced Nexium.

47.     This anticompetitive, exclusionary scheme was approved by AstraZeneca and implemented beginning in the late 1990's. The scheme required AstraZeneca to incur massive costs to develop and market a new drug, but AstraZeneca accurately predicted that these costs would be far outweighed by the continued monopoly profits that AstraZeneca would enjoy as a result of impairing generic competition.

48.     AstraZeneca's sole motive in launching Nexium and switching prescriptions from Prilosec to Nexium was to thwart effective competition from generic Prilosec. As members of the Shark Fin Project recognized, of the dozens of potential actions that were considered to replace the anticipated lost Prilosec sales, launching and switching prescriptions to Nexium was the worst for consumers. Nexium brought no significant medical benefit to consumers as compared to generic Prilosec. AstraZeneca also knew that, absent the adverse effect on sales of generic Prilosec, Nexium was a losing business proposition for AstraZeneca – the costs of research, development, and marketing of Nexium would not be justified by Nexium sales. Absent the adverse effect on sales of generic Prilosec, AstraZeneca's development and marketing of Nexium made no economic sense.

**Defendants' Development of Nexium While Blocking Generic Prilosec**

49.     Anticipating the expiration of Defendants' patent on omeprazole, several manufacturers of generic drugs filed ANDAs with the FDA seeking approval to market a generic version of Prilosec upon expiration of the basic omeprazole patent. Each of these applicants submitted a paragraph III certification with respect to that basic patent and paragraph IV certifications with respect to the other patents that AstraZeneca had listed in the Orange Book, stating that these additional patents were either invalid or would not be infringed by their proposed generic products. Within 45 days of receiving notice of each ANDA filing, AstraZeneca (or an affiliate) sued each generic firm for patent infringement under the Hatch-Waxman Act, thereby triggering a stay of regulatory approval on each firm's ANDA.

50.     These lawsuits were consolidated in the United States District Court for the Southern District of New York. *In re Omeprazole Patent Litigation*, MDL Docket No. 1291 (S.D.N.Y.) (Jones, J.). After a bench trial in late 2001 and early 2002, the district court ruled that the relevant patents were valid but were not infringed by the proposed generic product developed by one of the generic applicants, Kremers Urban Development Co. ("KudCo"). 222 F. Supp. 2d 423 (S.D.N.Y. 2002). KudCo's ANDA was subsequently approved by the FDA and KudCo entered the market with generic Prilosec in December, 2002, shortly after the district court decision. The Federal Circuit affirmed the district court's ruling in December, 2003. *In re Omeprazole Patent Litigation*, 84 Fed. App. 76 (Fed. Cir. 2003).

51.     During the delay that resulted from the patent infringement cases filed against generic firms, Defendants put into effect the strategy developed by the Shark Fin Project – developing a minutely altered form of Prilosec and converting as much of the Prilosec market as possible to that product prior to the commencement of generic competition.

52.     The minutely altered form of Prilosec developed by AstraZeneca was Nexium, which is identical to Prilosec except that Nexium contains esomeprazole rather than omeprazole as its active pharmaceutical ingredient.  As explained above, esomeprazole is the left-handed form of the molecule, while omeprazole contains equal parts of the left- and right-handed forms.  The two drugs are otherwise substantially identical.  Accordingly, when the FDA approved Nexium in February of 2001, it found that the drug did not contain a new active chemical entity and refused to reward Nexium with "New Chemical Entity" exclusivity.  *See* 21 U.S.C. § 355(c)(3)(D)(ii).

### Defendants' Product Switching Scheme

53.     As compared to omeprazole, esomeprazole offers no significant therapeutic or other benefit to consumers.  AstraZeneca developed Nexium and brought it to market solely because of its usefulness in AstraZeneca's scheme to impair generic competition.

54.     It is a well known phenomenon in the pharmaceutical industry that doctors who are in the routine of prescribing Product A will typically not begin prescribing Product B even if a generic version of Product B becomes available and is thus much less expensive than Product A.  This is true even if Products A and B are closely related chemical entities and even if Product A provides no significant medical benefits over Product B.  As noted in detail above, doctors are particularly susceptible to brand manufacturer advertising in the form of "detailing."  And as also noted in detail above, generic firms are economically precluded from employing large detailing forces.

55.     This phenomenon provides an opportunity for the manufacturer of two closely related brand-name pharmaceuticals, one of which is vulnerable to generic competition,

to shield that product from the full force of generic competition. For example, assume that in Year 1 a brand manufacturer makes sales of 100 units of Product B. The brand manufacturer knows that Product B will face generic competition in Year 3 and that the generics are expected to take 80% of the unit sales, or 80 units. In order to impair that generic competition, the brand manufacturer introduces Product A in Year 1 and directs its detailers to persuade doctors to stop prescribing Product B and instead begin prescribing Product A. Because the same brand manufacturer produces both Product A and Product B, there are no "counter-detailers" to dissuade the doctors from switching from Product B to Product A. In addition, the brand manufacturer can stop providing to doctors free samples of Product B and provide only free samples of Product A. Studies show that providing (or not providing) free samples has a substantial effect on which brand product doctors will prescribe. Through such a strategy, a brand manufacturer can progress from selling 0 units of Product A and 100 units of Product B in Year 1 to, for example, selling 70 units of Product A and 20 units of Product B in Year 3. Thus, instead of having an opportunity to sell 80% of 100 units of Product B, generic firms are limited to having an opportunity to sell 80% of only 20 units of Product B.

56.     This is exactly the generic-impairing strategy on which AstraZeneca's Shark Fin Project was based.

57.     In 2001, AstraZeneca employed approximately 6,600 detailers to promote its products to doctors. It has been reported that the company hired an additional 1,300 individuals just to detail Nexium. Beginning in March of 2001, these detailers (along with the ones AstraZeneca already employed) blanketed doctors' offices with literature, samples, and promotional material and began urging all Prilosec prescribers to stop prescribing Prilosec and to

18

start prescribing Nexium instead.

58.     Between March, 2001 and the launch of generic omeprazole on or about December 9, 2002, AstraZeneca's sales representatives were aggressively detailing doctors to prescribe Nexium instead of Prilosec based on the claimed superiority of the new drug over the old.  AstraZeneca spent approximately $1 billion on detailing and advertising Nexium during the two years after it was introduced.

59.     As part of its detailing effort, AstraZeneca also provided doctors with free samples of Nexium and stopped providing free samples of Prilosec.  Doctors typically give free samples of drugs to their patients and simultaneously give the patient a prescription for that drug. By providing samples of Nexium rather than Prilosec, AstraZeneca encouraged physicians to stop prescribing Prilosec and start prescribing Nexium.

60.     Upon the introduction of Nexium, AstraZeneca stopped detailing and promoting Prilosec, despite the fact that Prilosec did not yet face generic competition and would not face such competition for another 18 months.  AstraZeneca stopped making positive product claims about Prilosec and, instead, began making negative and false or misleading claims about the effectiveness of Prilosec in treating the conditions for which it is prescribed.  AstraZeneca attempted to weaken the competitive position of Prilosec, in favor of Nexium, for the sole reason that doing so would also weaken the competitive position of the anticipated generic versions of Prilosec.

61.     AstraZeneca's strategy was enormously successful in impairing generic competition for Prilosec.  In 2000, before the introduction of Nexium, AstraZeneca had U.S. sales of Prilosec of 29.6 million units.  With the introduction of Nexium in March, 2001, and

with AstraZeneca's determined efforts to switch doctors from Prilosec to Nexium, in 2002

AstraZeneca had U.S. sales of 19.6 million units of Prilosec and 13.4 million units of Nexium.

With the introduction of generic omeprazole in December, 2002, AstraZeneca continued its

market-switching strategy into 2003. In 2003, AstraZeneca continued to switch sales from

Prilosec to Nexium, growing Nexium's unit sales from 13.4 million in 2002 to 18.8 million in

2003 (much of the growth at the expense of Prilosec).

      62.    While this product-switching strategy was enormously successful and

profitable for AstraZeneca, it was an economic disaster for American consumers. As compared

to Prilosec, Nexium provides no significant medical benefits to consumers. Yet, had

AstraZeneca not engaged in the product-switching scheme, a minimum of 13.4 million more

units of Prilosec would have been available annually – beginning in December of 2002 and

continuing until the termination of AstraZeneca's Nexium patents in 2014 – for generic

competition. AstraZeneca's product-switching scheme thus has potentially cost direct purchasers

of prescription omeprazole and esomeprazole more than $11.5 billion in increased prescription

costs.

      63.    AstraZeneca's product-switching from Prilosec to Nexium was profitable

for AstraZeneca only because the strategy had the effect of impairing generic competition to

Prilosec. Absent that effect, engaging in the product switch would have made no economic sense

for AstraZeneca. In 2000, AstraZeneca had U.S. sales of 29.6 million units of Prilosec; in 2002,

AstraZeneca had U.S. sales of 33 million units of Nexium and Prilosec combined (an 11.4%

increase). During this same time period, however, the combined U.S. sales of all proton-pump

inhibitors increased from 56.5 million units to 73.9 million units (a 30.8% increase). Thus, sales

20

in the overall therapeutic category increased at nearly three times the rate as that of combined

Nexium/Prilosec U.S. sales. Thus, AstraZeneca had *less* U.S. sales of Nexium and Prilosec

combined than if AstraZeneca had sold only Prilosec (absent the effect of impairing generic

competition). As AstraZeneca knew when it decided to engage in its scheme, the product

switching caused AstraZeneca to lose the momentum from its prior Prilosec detailing and

advertising efforts and caused some doctors, when asked to switch from Prilosec to Nexium, to

instead switch from Prilosec to a non-AstraZeneca proton-pump inhibitor.

        64.      In addition to this loss of sales, AstraZeneca also incurred enormous out-

of-pocket expenses in order to effect the product switch from Prilosec to Nexium. These

enormous expenses, calculated in the billions of dollars, include (but are not limited to) the costs

of research and development to produce and obtain FDA approval for Nexium, incremental

detailing and marketing expenses, stocking allowances paid to retailers to induce them to carry

Nexium, and returned goods allowances paid to wholesalers and other direct purchasers in

connection with the return of unused shipments of Prilosec.

        65.      AstraZeneca incurred these enormous costs in order to introduce a product

that was no better than Prilosec and to make *less* sales of Nexium and Prilosec combined than if

AstraZeneca had sold only Prilosec (absent the effect of impairing generic competition).

AstraZeneca's product-switching strategy made no economic sense absent its effect of impairing

generic competition for Prilosec.

### The Scheme to Mislead Doctors and Patients

        66.      AstraZeneca sought FDA approval to market Nexium for three

indications: (1) treatment of symptomatic gastroesophageal reflux disease ("GERD"), or

common heartburn; (2) treatment of erosive esophagitis; and (3) maintenance of healing of erosive esophagitis. The vast majority of prescriptions for Nexium and other proton-pump inhibitors are written for GERD, or common heartburn. While an estimated 60 million Americans – more than 40 percent of adults – experience symptoms of GERD, less than 2 percent suffer from erosive esophagits, a condition that cannot be diagnosed without a doctor's performing an invasive endoscopy.

67. AstraZeneca conducted and submitted the results of fourteen clinical studies to the FDA as part of its effort to obtain FDA approval for the sale and marketing of Nexium. Several of the clinical trials compared Nexium to a placebo. These placebo-controlled studies were conducted and submitted in order to demonstrate Nexium's efficacy. Such placebo-controlled studies can alone be sufficient to obtain FDA approval for a new drug.

68. As part of the anticompetitive scheme hatched by the Shark Fin project, AstraZeneca was intent on finding any basis, however slim or clinically insignificant, to proclaim that Nexium was an improvement over Prilosec. To that end, AstraZeneca also commissioned several "active-controlled" studies comparing Nexium to Prilosec. Although AstraZeneca executives believed it was unlikely that Nexium would demonstrate any improvement over Prilosec in the treatment of heartburn – the most common condition for which Nexium and Prilosec are prescribed – the executives hoped that Nexium would demonstrate some small advantage over Prilosec in the treatment of the rarer condition erosive esophagitis ("EE").

69. To that end, in 1997, AstraZeneca commissioned three active-controlled clinical trials comparing Nexium to Prilosec in the healing of EE. Each trial was very expensive for AstraZeneca costing, at least, tens of millions of dollars. Indeed, these trials were particularly

expensive for AstraZeneca because – in an attempt to capture any statistically significant difference, no matter how slight and no matter whether the statistical difference would amount to any actual clinical significance – AstraZeneca commissioned studies with an exceptionally large number of subjects. For example, in the two *placebo*-controlled clinical trials in maintenance of healing of EE submitted to the FDA, AstraZeneca studied 318 and 375 patients. These numbers are fairly typical. However, in the three *active*-controlled studies comparing Nexium to Prilosec, AstraZeneca recruited 1,960, 1,148, and 1,176 patients. These numbers are extremely large. AstraZeneca did this because it believed that only such a large sample size gave it any hope of finding any statistically significant (but not necessarily clinically significant) difference between Nexium and Prilosec. In the end, however, this expensive endeavor was a failure. The studies comparing Nexium to Prilosec did not support a conclusion that Nexium was an improvement over Prilosec even in the healing of EE.

70.    The first study, Clinical Study No. 172 (as known by the FDA) or SH-QBE-0013 (as recorded internally by AstraZeneca) (hereafter, "Study 172"), was a multicenter, randomized, double-blind, eight week comparative efficacy and safety study of Nexium 40mg, Nexium 20mg, and Prilosec 20mg in the healing of EE. Study 172 was conducted from September 29, 1997 to May 18, 1998. 1,960 patients with EE were recruited for inclusion in the study. AstraZeneca purported to justify this unusually large number of patients by designing the study to detect, with at least 95% certainty, a 10% difference in EE healing rate between Nexium and Prilosec. AstraZeneca chose this intended difference in healing rate to justify a sufficiently large sample size to capture any minute difference in healing rate.

71.    Neither in Study 172, nor in any other AstraZeneca study commissioned in

support of the Nexium FDA application, did AstraZeneca compare Nexium at 40mg to Prilosec at 40mg in the healing of EE.  AstraZeneca limited its studies to, for the most part, a misleading comparison between a higher dosage of Nexium versus a lower dosage of Prilosec.

72.     The misleading design of AstraZeneca's studies (by not comparing Nexium 40mg to Prilosec 40mg) is further confirmed by two facts:  First, although Prilosec had been approved by the FDA for healing of EE at the 20mg level, AstraZeneca knew that this fact in no way limited its ability to test Prilosec at a higher dosage.  AstraZeneca acknowledges this well-known fact about clinical-trial design on its website, where it publishes information about its clinical trials.  There, it states: "As with any comprehensive clinical trial programme, individual studies may include both approved and non-approved treatment regimens, including doses higher than those approved for clinical use."

73.     Second, by 1997, AstraZeneca was well aware that Prilosec demonstrated a dose-dependent response in the treatment of EE, at least up to 40mg.  In other words, 40mg of Prilosec had been shown to be more effective than 20mg of Prilosec in the healing of EE.  For example, a June, 1993 article, co-authored by two Astra Pharmaceuticals researchers, discussed a clinical study "demonstrating a dose-response relationship" with Prilosec.  Other studies have reached a similar conclusion.  Accordingly, AstraZeneca knew that, even if its Nexium clinical studies achieved the results it wished, the question would be begged whether Nexium 40mg was better than Prilosec 40mg.  As part of its anticompetitive scheme, AstraZeneca intended to leave this question begged, so it could create and exploit an ambiguity in its marketing and publication campaign.

74.     The results of Study 172, although somewhat ambiguous, partly because of

24

the Study's design, do not justify a claim of Nexium's superiority over Prilosec in the healing of EE. Study 172 found no statistically significant difference between Nexium 20mg and Prilosec 20mg at 4 weeks. At 8 weeks, in the intention-to-treat ("ITT") population analysis, one of the significance tests used (the log-rank test) found a statistically significant difference, but other tests did not. Significantly, even the log-rank test found no statistically significant difference between Nexium 20mg and Prilosec 20mg at 8 weeks in the "per protocol" ("PP") population. This is significant because the PP population consists of those patients who complied with the Study's protocol. Later, when AstraZeneca published the results of Study 172, it omitted PP data.

75.    Although Study 172 did find a statistically significant difference between Nexium 40mg and Prilosec 20mg at 4 and 8 weeks, the results of the comparison between Nexium 20mg and Prilosec 20mg begged the question whether this result was dosage-dependent. As noted, Study 172 also had certain design features that complicate interpretation of the resulting data. Study 172 compared three variables (Nexium 40mg, Nexium 20mg, and Prilosec 20mg) as opposed to just two. From a statistical and study-design perspective, it is easier to compare A to B (or "two arms") than to compare A to B to C.

76.    The second study AstraZeneca commissioned comparing Nexium and Prilosec in the healing of EE simplified the study design of Study 172. Clinical Study No. 173 (as known by the FDA) or SH-QBE-0016 (as recorded internally by AstraZeneca) (hereafter, "Study 173") was a multicenter, randomized, double-blind, eight-week comparative efficacy and safety study of Nexium 40mg versus Prilosec 20mg in subjects with EE. Study 173 was conducted from October 14, 1997 to May 11, 1998. Again, AstraZeneca designed Study 173 to

25

justify a large sample size – 1,148 patients.

77.    The results of this straightforward, two-arm study showed that Nexium, even at the higher dosage tested, was not superior to Prilosec in the healing of EE.  Study 173 found *no* statistically significant differences between Nexium 40mg and Prilosec 20mg in the healing of EE in either the ITT or PP population at either 4 or 8 weeks.  Moreover, the Study found *no* significant differences between Nexium 40mg and Prilosec 20mg in time to first resolution of heartburn, in time to start of sustained resolution of heartburn, or in percentage of heartburn free days or nights.  As discussed further below, as part of AstraZeneca's deceptive publication strategy, it did not publish the results of Study 173, although it did publish the results of Study 172 in a misleading fashion and omitting reference to Study 173.

78.    The third study, Clinical Study No. 174 (as known by the FDA) or SH-QBE-0017 (as recorded internally by AstraZeneca) (hereafter, "Study 174"), was a multicenter, randomized, double-blind, eight week comparative efficacy and safety study of Nexium 20mg and Prilosec 20mg in the healing of EE.  Again, the design of the study was straightforward and the results clear.  Study 174 found *no* statistically significant differences between Nexium 20mg and Prilosec 20mg in the healing of EE at week 8.  At week 4, Prilosec 20mg had a *higher* healing rate than Nexium 20mg.  Moreover, Study 174 found a statistically significant difference in the percentage of patients exhibiting resolution of investigator-recorded GERD symptom dysphagia at week 4, *favoring* Prilosec 20mg *over* Nexium 20mg.  The Study found no other significant differences between Nexium 20mg and Prilosec 20mg in GERD-related symptoms, including heartburn, acid regurgitation, and epigastric pain.

79.    AstraZeneca did not publish the results of Study 174.

26

80.    Also in 1997, AstraZeneca performed three additional supportive trials comparing Nexium to Prilosec in the treatment of heartburn: one comparing each of 40 mg and 20 mg of Nexium with 20 mg of Prilosec, another comparing 40 mg of Nexium and 20 mg of Prilosec, and a third comparing 20 mg of Nexium and 20 mg of Prilosec. All three studies failed to show a statistically significant difference as between the use of Nexium and Prilosec to treat heartburn, even as between Nexium 40mg and Prilosec 20mg.

81.    In 1999, in a last-ditch effort to find some data that could be exploited to support deceptive claims of Nexium's superiority, AstraZeneca conducted another clinical trial comparing Nexium and Prilosec. Again, however, AstraZeneca compared a higher dosage of Nexium (40mg) to a lower dosage of Prilosec (20mg) in the healing of EE. In Clinical Study No. 222 (recorded by AstraZeneca as SH-QBE-0052), AstraZeneca increased substantially the number of participants in the trial from the already inflated numbers of Studies 172, 173, and 174. This time, the results showed a statistically significant difference between Nexium 40mg and Priolsec 20mg in the healing of EE at 4 and 8 weeks.

82.    The clear conclusion from the four studies is that there is no non-dose-related clinical difference between Nexium and Prilosec, even in the treating of EE. This was the conclusion of the FDA, including the FDA Medical Officer and the FDA Statistical Reviewer, both of whom reviewed the set of clinical studies submitted by AstraZeneca. The FDA Medical Officer concluded that "superiority of NEXIUM over omeprazole was not demonstrated." According to the FDA Medical Officer's Review, "a superiority claim of NEXIUM over omeprazole is NOT SUPPORTED by either the comparison of [Nexium 20 mg] vs. [Prilosec 20 mg] or the comparison of [Nexium 40 mg] vs. [Nexium 20 mg]." Summarizing the set of

27

studies, the Review concluded, "There are no studies which demonstrate that [Nexium] is superior to [Prilosec], clinically or even statistically."

83.    In summarizing the medical review, the reviewer noted in a report dated September 21, 2000, that "the sponsor's conclusion that [Nexium] has been shown to provide a significant clinical advance over omeprazole in the first-line treatment of patients with acid-related disorders is not supported by data."  The reviewer's conclusion reiterated that "it is recommended not to allow the sponsor to claim that esomeprazole magnesium has any significant clinical advantage over omeprazole in the first-line treatment of these acid-related disorders because no data in support of such a claim have been submitted."

84.    Similarly, Yi Tsong, PhD, Mathematical Statistician, who reviewed the studies as part of the FDA's Statistical Review, concluded that the results of Studies 172, 173, 174, and 222 did "not lead to the conclusion that [Nexium] is superior to [Prilosec] in healing EE."

85.    The FDA accepted the reviewers' recommendation and did not permit AstraZeneca to assert that Nexium provides a significant clinical advance over Prilosec.  In negotiations between the FDA and AstraZeneca concerning the labeling for Nexium, AstraZeneca itself agreed that the clinical trials did not support any claim that Nexium is superior to Prilosec.  In a meeting on February 6, 2001, AstraZeneca's Vice President informed the FDA that "AstraZeneca is not stating that Nexium is better than omeprazole."  AstraZeneca's product director stated that AstraZeneca wanted to include the results of the trials in Nexium's product label in order "to make physicians understand that Nexium is not superior to omeprazole."  In reliance on these assurances, the FDA approved the Nexium product label and the inclusion of

the trial results in the label.

### AstraZeneca's False, Deceptive, and Misleading Campaign to Effect the Switch

86.    Notwithstanding the FDA's conclusion and AstraZeneca's own concession that the clinical data did not support a claim of superiority of Nexium over Prilosec, AstraZeneca launched a massive advertising, detailing, and publication campaign designed to persuade the medical community, doctors, and consumers that Nexium was an improvement over Prilosec. This false, deceptive, and misleading campaign was devised by AstraZeneca to impair generic competition to its most profitable product.  AstraZeneca conducted this campaign, despite its enormous cost, in order to maintain its monopoly position in the market.

87.    AstraZeneca's campaign had multiple components:  AstraZeneca selectively published the results of its clinical studies in a misleading fashion, in order to distort the medical literature.  It engaged in a misleading and deceptive detailing campaign to doctors. AstraZeneca also engaged in a misleading and deceptive direct-to-consumer advertising campaign.

### A.    AstraZeneca's Publication Strategy

88.    Despite the FDA's conclusion and AstraZeneca's own concession that its clinical data did not support a claim of superiority of Nexium over Prilosec, AstraZeneca selectively chose to publish the results, in a misleading fashion, of the two studies it could use to support a false claim of Nexium's superiority.  The selective publication of these studies, and the way their results were presented in the articles, contributed to the false impression conveyed in the medical literature that Nexium was superior to Prilosec in the healing of EE.

89.    Certain results of Study 172 were published by an AstraZeneca-affiliated

29

group billing itself as "The Esomeprazole Study Investigators" in the journal Alimentary Pharmacology and Therapeutics in July of 2000. As discussed above, and as AstraZeneca acknowledged to the FDA, Study 172 did not support a conclusion of a non-dose-dependent difference between Nexium and Prilosec in the healing of EE. The article published by the Esomeprazole Study Investigators, however, was misleading on this key point. For starters, the title of the article indicated that Study 172 had found a difference that was not dose-related: "*Esomeprazole improves healing and symptom resolution as compared with omeprazole in reflux oesophagitis patients: a randomized controlled trial.*" In fact, Study 172 found nothing about "esomeprazole" as a drug versus "omemprazole" as a drug. At most, it found a difference between different dosage strengths of the drugs, and, by the time of the article's publication, AstraZeneca knew that other, more-straightforward studies had found no differences between Nexium and Prilosec. The "Conclusion" of the article perpetuated this misrepresentation: "Esomeprazole was more effective than omeprazole in healing and symptom resolution in GERD patients with reflux oesophagitis, and had a tolerability profile comparable to that of omeprazole."

90.     The article's discussion of the study results was also misleading. For example, as noted above, the authors omitted the results on the PP population, which allowed them to claim a statistically significant difference between Nexium 20mg and Prilosec 20mg at 8 weeks. Also, the authors did not disclose that while one test (the log-rank test) found a difference in the ITT population, another test (the Wilcoxon test) did not.

91.     Neither the "Esomeprazole Study Investigators", nor any other AstraZeneca affiliated group published the results of Studies 173 and 174, although these studies

were crucial to understanding the equivalence of Nexium and Prilosec. As intended by AstraZeneca, this selective publication strategy – combined with the misleading presentation of the articles that were published – had distorting effects in the medical literature.

92.    These distorting effects have been lasting and felt worldwide. For example, a May, 2005 article published by Taiwanese researchers in the World Journal of Gastroenterology summarized the results of tests comparing Nexium 40mg versus Prilosec 20mg in Asian subjects. Regrettably, the article's authors took it as *a given* that "many studies conducted in Western countries have confirmed the superior efficacy of esomeprazole over omeprazole in treating GERD patients." In support of this statement, the authors cited two articles: one discussed the biovailability of esomeprazole; the other is the article on Study 172 authored by the Esomeprazole Study Investigators.

93.    However, although AstraZeneca's publication strategy had the intended effect of misleading some in the medical community into believing just what it assured the FDA it would not say – that Nexium is better than Prilosec – the equivalence of the drugs continues to be confirmed. In their study of Asian patients, the Taiwanese researchers found no statistically significant difference between Nexium 40mg and Prilosec 20mg in the healing of EE, or in the relief of heartburn, or any other reflux relieving symptoms. However, because AstraZeneca's publication strategy had apparently convinced these researchers that they should expect to see a difference between Nexium and Prilosec, they considered their own study results dubious. The Taiwanese researchers concluded that the "indistinguishable efficacy of esomeprazole *vs* omeprazole treatment" in their study "most likely originated from" an error in study design.

94.    In other words, AstraZeneca's deceptive campaign has been so successful

that even scientists whose own clinical trials find Nexium and Prilosec to be "indistinguishable" find it hard to shake the misconception that Nexium is not superior to Prilosec in the treatment of EE.

95.    AstraZeneca also caused the results of Study 222 to be published in a misleading fashion.  The Esomeprazole Study Investigators published the results of Study 222 in 2001 in the American Journal of Gastroenterology.  This time, not only did the AstraZeneca-affiliated authors make sweeping claims about the superiority of Nexium over Prilosec (without disclaiming that the results were dose related, or even indicating that possibility), they falsely attributed Nexium's purported superiority over Prilosec to pharmacokinetic and pharmacodynamic properties of Nexium.

96.    For example, the authors of the article stated:  "Esomeprazole demonstrates significantly greater efficacy than omeprazole in the treatment of GERD patients with erosive esophagitis."  And:  "The greater efficacy of esomeprazole compared with omeprazole demonstrated in this clinical trial and in that of Kahrilas [re: Study 172] is related to the pharmacokinetic and pharmacodynamic profile of the drug."  And:  "Thus, for the first time, a PPI, esomeprazole, has been shown to offer significant advantages over omeprazole in terms of healing of erosive esophagitis."  And:  "The results of this study indicate that esomeprazole provides a significant advantage over omeprazole in terms of esophageal healing and relief of heartburn in GERD patients with erosive esophagitis, irrespective of baseline severity of disease."  All of these statements were false, deceptive, and misleading.

B.    **AstraZeneca's Deceptive Detailing Campaign**

97.    AstraZeneca sales representatives spent 2000 and 2001 in a frenzied sales

pitch as to the superior qualities of Nexium.  Nexium advertisements directed to physicians

claimed that the new drug was more powerful than Prilosec:  "we've captured the essence of

Prilosec and created a new PPI … introducing Nexium the powerful new PPI from the makers of

Prilosec…."

98.    AstraZeneca flew its entire sales force to Hawaii for an intensive training

session on how to pitch Nexium.  The sales force was trained to push Nexium to resistant doctors

who were satisfied with Prilosec.  Teleconferences were held wherein the sales force rehearsed

the pitch to be made to doctors.

99.    AstraZeneca's sales force flooded doctors' offices with free samples and

claims of Nexium's superiority.  Members of the sales force were penalized in their bonuses if

they gave away free samples of Prilosec.  The sales force would only bring up Prilosec to doctors

to compare it unfavorably to Nexium.  A July 6, 2002, Wall Street Journal article describes one

example of a type of pitch made to doctors:

> Peter Halper, an internist at a large group practice in Manhattan, has a computer
> given him by a drug-marketing firm on condition he chat with drug-company
> marketers via the Internet from time to time.  Recently, he checked in with
> AstraZeneca.  The face of a salesman popped onto his screen, asking him how he
> was and then launching into a pitch for Nexium.
>
> Dr. Halper asked the salesman why Nexium was better.
>
> "The proof's in the healing rates," said the live salesman, who cited data
> comparing 40mg of Nexium to 20mg of Prilosec.  "We're safer, with no drug-to-
> drug interactions.  We're also the No. 1 proton-pump inhibitor among
> gastrointestinal specialists."  While he spoke, several graphs flashed on the screen.
>
> "So have I shown you how we differ from other drugs?" the salesman asked.  Dr.
> Halper said he had.  "Do you need any more samples delivered?"  No, Dr. Halper
> said, he had plenty.  Minutes later, two salesmen from AstraZeneca arrived to talk
> to Dr. Halper about Nexium.  They made sure to restock his cabinet with free
> Nexium.
>
> 100.    Dr. Halper was not the only doctor receiving false, deceptive, and

misleading information from AstraZeneca's sales force. As discussed above, there is, in fact, no "proof" that Nexium is better than Prilosec.

101. AstraZeneca also made statements at conferences and meetings of physicians purporting to demonstrate Nexium's superiority over Prilosec. For example, at the Pri-Med primary care continuing medical education conference held in Boston in October of 2004, one of the largest such conferences in the country, AstraZeneca representatives engaged physicians in discussions about Nexium and encouraged doctors to take their marketing material. The back cover of one pamphlet is headlined "Acid Protection THE NEXIUM DIFFERENCE." The graph presents the results of a study showing that Nexium 40mg maintains gastric acid suppression (gastric pH>4) for 14.0 hours compared to, among other drugs, Prilosec 20mg, which maintains gastric pH at this level for 11.8 hours. AstraZeneca intended by this presentation to convince trusting doctors that Nexium confers some clinical benefit over Prilosec. However, AstraZeneca knew that the clinical relevance of pH data has not been established. And, as discussed above, it had already disclaimed to the FDA any intention of claiming that Nexium conferred a clinical advantage over Prilosec, because there is no basis for such a claim.

**C.    AstraZeneca's Deceptive Direct-to-Consumer Campaign**

102. AstraZeneca's massive direct-to-consumer ("DTC") advertising campaign was designed to suggest to consumers that Nexium was an improvement over Prilosec. After its launch, Nexium became the most heavily marketed drug in America. In the first ten months of 2001 alone, AstraZeneca spent $98 million on DTC promotions. The media was blanketed with Nexium ads – "Today's Purple Pill is Nexium, from the makers of Prilosec." Very quickly, the "New Purple Pill," Nexium, began to replace Prilosec for brand-name recognition as the

heartburn medicine of choice by the public and physicians.

103.    The intent of the DTC advertising was to cause consumers to request Nexium by name from their doctors.  Studies show that such advertising is effective in causing patients to pressure doctors into prescribing expensive and marginally helpful new drugs. Doctors often find it easier and faster to write the prescription than to explain cheaper alternatives.

104.    Soon AstraZeneca dropped all reference to Prilosec in its advertisements in an effort to replace Prilosec in the minds of consumers with Nexium.

105.    AstraZeneca's ads targeting consumers referred to its clinical studies comparing Nexium and Prilosec in a manner designed to confuse consumers into believing that Nexium had been proven superior to Prilosec.  For example, AstraZeneca ads touted Nexium as a pill to "Stop the heartburn – Start the HEALING," followed by this sentence:  "*In erosive esophagitis studies compared with Prilosec (omeprazole)*."  A plausible reading of such an ad for the consumer is that Nexium is better than Prilosec in stopping heartburn and starting healing – otherwise, the reference to studies "comparing" Nexium with Prilosec would appear gratuitous.

106.    Soon after Nexium's launch, AstraZeneca largely ceased mentioning Prilosec at all in its ads, in an effort to remove Prilosec from the minds of consumers.  One ad, for example, proclaimed that "NEXIUM heals acid related damage better than the other leading medicine."  Such a statement is false, unless Prilosec is not considered a leading medicine.  In smaller print in the ad, AstraZeneca specified that it was comparing Nexium to Prevacid, another PPI.  Nowhere did it inform consumers that Nexium worked no better than Prilosec in healing acid related damage, although such information was necessary for the ad not to be misleading.

107.    AstraZeneca's Nexium ads remain, to this day, misleading to consumers and designed to cause consumers to go to their doctors and insist upon being prescribed Nexium by name.  For example, recent ads proclaim:  "Even if you're treating your heartburn, you may still have damage."  The ads suggest that 1 in 3 people with "acid reflux disease" may have EE, based on undisclosed AstraZeneca data.  The purpose of the ad is to get consumers with heartburn concerned that they need to obtain prescription Nexium in case they also have damage to their esophagus.  However, the ad does not disclose that prescription Nexium is no better than Prilosec in healing such damage.

### Defendants' Withdrawal of Prescription Prilosec from the Market

108.    AstraZeneca was not content merely to switch the market to Nexium and let the manufacturers of generic Prilosec fight for the few Prilosec prescriptions that might continue to be written.  Instead, AstraZeneca effectively withdrew branded Prilosec from the market.

109.    More than 70% of all U.S. consumers have health coverage provided by managed care organizations ("MCOs") that pay for some or all of the costs of prescription pharmaceuticals.  AstraZeneca knew that it is the policy of MCOs covering the vast majority of consumers to discontinue providing coverage for prescription pharmaceuticals when an over-the-counter ("OTC") version of a prescription product becomes available.  Although the costs of OTC medications are thus generally borne by consumers themselves rather than by their insurers, OTC medications may result in overall lower health care costs.  AstraZeneca, however, arranged things differently.

110.    On January 27, 2000, AstraZeneca and its OTC marketing partner, Procter

36

& Gamble, jointly applied to the FDA for approval to market Prilosec OTC. Importantly, they

sought approval only for short-term (initially 10 day and later 14 day) use of OTC Prilosec even

though the quantity of active ingredient in OTC Prilosec and prescription Prilosec (for longer-

term use) is the same.

111.    On June 20, 2003, the FDA approved the sale of Prilosec OTC. The FDA

awarded AstraZeneca three years of exclusivity in the OTC market because of safety studies

performed and submitted by AstraZeneca. Thus, AstraZeneca was the only manufacturer of OTC

omeprazole until June, 2006.

112.    AstraZeneca (through its distributor, Procter & Gamble) began selling

Prilosec OTC in September of 2003, approximately ten months after the launch of generic

Prilosec.

113.    As AstraZeneca knew and intended, upon the introduction of Prilosec

OTC in September of 2003, MCOs covering the vast majority of consumers refused to provide

coverage for prescription Prilosec because of the availability of the OTC version. Coupons for

purchase of OTC Prilosec were distributed through managed care companies which at the same

time removed prescription Prilosec from their approved coverage lists. As AstraZeneca also

knew and intended, the MCOs also stopped providing coverage for *generic* Prilosec. And as

AstraZeneca further knew and intended, the MCOs did so even though OTC Prilosec was

recommended for use only for 14 days or less.

114.    AstraZeneca advises patients who begin therapy on OTC Prilosec, but who

need longer-term treatment, to consult their physicians to obtain an appropriate prescription. As

a result of AstraZeneca's conduct, however, patients who consult their physicians and their

37

MCOs will learn that there is no coverage for prescription Prilosec, whether brand or generic. The chemically closest product to OTC Prilosec (other than the non-covered Prilosec) is, of course, Nexium. Thus, a physician writing a prescription for a patient who has started therapy on OTC Prilosec is likely to write the prescription for Nexium. Moreover, because most MCOs no longer cover prescription Prilosec, the physician can confer a financial benefit on the patient by prescribing Nexium rather than advising the patient to continue taking Prilosec OTC or writing a prescription for Prilosec, both of which would have to be paid for out of the patient's own pocket.

115.    Thus, by obtaining FDA approval to market OTC Prilosec, but only for short-term use, AstraZeneca simultaneously: (1) caused MCOs not to cover branded Prilosec and thus effectively withdrew branded Prilosec from the market; (2) caused MCOs not to cover generic Prilosec; and (3) drove patients who otherwise would have received less-expensive generic Prilosec to receive instead a prescription for much more expensive branded Nexium.

116.    AstraZeneca exacerbated the anticompetitive consequences of this aspect of its scheme by providing an insufficient supply of Prilosec OTC to meet market demand. Throughout the three-year term of AstraZeneca's OTC market exclusivity, the market was beset with shortages of the Prilosec OTC supply. As the sole manufacturer of Prilosec OTC, AstraZeneca was solely responsible for these artificial shortages. In fact, the foreseeable effect of these shortages was to drive patients to see their physicians and obtain a prescription for Nexium.

117.    The success of this aspect of AstraZeneca's scheme is again seen in the data on unit sales. In 2003, the combined U.S. sales of branded and generic Prilosec were 15.9 million units. In 2004, after the initiation of AstraZeneca's Prilosec OTC scheme in September 2003, the combined sales of branded and generic prescription Prilosec declined to just 9 million

units. A substantial portion of those lost units is accounted for in increased unit sales of Nexium, which increased from 18.8 million in 2003 to 20.6 million in 2004.

## CLASS ALLEGATIONS

118.    Plaintiff brings this action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and the following class (the "Class"):

> All persons and entities in the United States who purchased omeprazole/esomeprazole directly from any of the Defendants at any time from December 18, 2002 to the present and continuing until the effects of Defendants' anticompetitive conduct cease (the "Class Period"). Excluded from the Class are Defendants and their parents, employees, subsidiaries, and affiliates, and federal government entities.

119.    The Class is sufficiently numerous that joinder of all members is impracticable. Class members include wholesalers, hospitals, health maintenance organizations, and/or retail chain drug stores. The Class includes eighty or more members, and the exact identity of Class members is ascertainable from the records of Defendants.

120.    Numerous questions of law and fact are common to the Class, including:

    a.    whether Defendants willfully obtained and/or maintained monopoly power over omeprazole and its enantiomers;

    b.    whether Defendants, or their affiliates or agents, falsely, deceptively, or misleadingly claimed that Nexium was superior to Prilosec;

    c.    whether Defendants limited the supply of Prilosec in order to

39

increase sales of Nexium;

d.    whether Defendants engaged in conduct to withdraw prescription Prilosec from the market;

e.    whether Defendants' conduct impeded the sale of generic omeprazole in the United States;

f.    whether the acts of Defendants alleged herein have substantially affected interstate commerce; and

h.    whether, and to what extent, Defendants' conduct caused antitrust injury in the nature of overcharges to Plaintiff and the members of the Class, and if so, the appropriate measure of damages.

121.    These and other questions of law and fact are common to the members of the Class and predominate over any questions affecting individual members.  Defendants have acted on grounds generally applicable to the Class.

122.    Plaintiff's claims are typical of the claims of the Class because Plaintiff and all Class members suffered antitrust injury by the same wrongful conduct by Defendants. All Class members have paid artificially inflated prices for the drugs at issue.  The claims of each Class member arise out of the same nucleus of operative facts and are based on the same legal theories.

123.    Plaintiff will fairly and adequately represent and protect the interests of the Class.  Plaintiff has retained counsel experienced in class action and antitrust litigation.  Plaintiff has no interest in this litigation that is adverse to, or in conflict with, the interests of other members of the Class.

124.    A class action is superior to any other available methods for the fair and efficient adjudication of this controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would require.  The benefits of proceeding by way of class action, including providing injured persons or entities with a method for obtaining redress on claims that they might not be able to pursue individually, substantially outweigh any difficulties that may arise in the management of a class action.

125.    Plaintiff knows of no difficulty that would be encountered in the management of the claims advanced by the Class that would preclude certification.

## RELEVANT MARKET

126.    To the extent it is necessary to define a relevant market, the relevant product market is the sale of prescription pharmaceutical products containing the omeprazole/esomeprazole molecule – *i.e.*, Prilosec, Nexium, and any AB-rated generic equivalent of either.  The relevant geographic market is the United States.  A firm that was the only seller of such products in the United States could impose a significant, non-transitory price increase without losing sufficient sales to render the price increase unprofitable, as demonstrated by AstraZeneca's ability profitably to charge supracompetitive prices.

127.    From the time it introduced Prilosec until December of 2002, AstraZeneca had a 100% share of the relevant market.  Thereafter, and solely because of the exclusionary conduct alleged above, AstraZeneca has maintained a market share of at least 70%.  But for the exclusionary conduct alleged above, AstraZeneca would have been forced to lower its prices to

the price charged for generic omeprazole or its market share after December, 2002 would have fallen precipitously to less than 20%.

128.    At all relevant times AstraZeneca has maintained an ability to price its omeprazole/esomeprazole prescription products substantially above its costs of production. Its prices have exceeded manufacturing costs by approximately 90%.

129.    AstraZeneca's unlawful actions were taken for the purpose of impairing generic competition and allowing it to continue to charge monopoly prices.

## EFFECTS OF DEFENDANTS' UNLAWFUL CONDUCT

130.    Defendants' exclusionary conduct has impaired the sale of generic omeprazole in the United States, and has unlawfully enabled Defendants to sell the omeprazole/esomeprazole molecule at monopolistic, artificially inflated prices. By engaging in such conduct, Defendants have harmed the competitive process and have perpetuated their ability to extract supracompetitive prices from purchasers. But for Defendants' illegal conduct, generic firms would have been able to compete for all sales of the chemical beginning in December, 2002, and Plaintiff and other purchasers would have benefited from that competition by substituting lower-priced generic omeprazole for all of their purchases of higher-priced Nexium.

131.    There are no procompetitive justifications for Defendants' conduct. The conduct alleged above created no efficiency gains or increases in consumer welfare. On the contrary, Defendants' conduct substantially decreased or eliminated the efficiency gains that would otherwise have occurred through the successful introduction of a less expensive generic version of Prilosec that could be substituted at the pharmacy counter for branded Prilosec -- efficiency gains that Congress and State legislatures intended to bring about when they enacted

42

the Hatch-Waxman Act and State generic substitution laws.

132.    As a result of Defendants' unlawful and exclusionary conduct, Plaintiff continued to purchase branded omeprazole/esomeprazole from Defendants at monopoly prices rather than generic omeprazole from a generic manufacturer at lower prices.  Plaintiff continues to be overcharged by paying higher prices than would have prevailed in the absence of Defendants' unlawful conduct.

## COUNT ONE
## Monopolization (15 U.S.C. § 2)

133.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

134.    At all relevant times, AstraZeneca has possessed monopoly power in the relevant market.

135.    During the relevant period, AstraZeneca willfully and unlawfully maintained its monopoly power by, *inter alia*: (a) introducing Nexium, a drug virtually identical to and no more effective than Prilosec, solely to prevent generic competitors from competing for all sales of the omeprazole/esomeprazole molecule; (b) engaging in a massive and deceptive advertising and promotional campaign to switch patients from Prilosec to Nexium in anticipation of the entry of generic versions of Prilosec; (c) effectively withdrawing branded Prilosec from the market, causing MCOs not to cover the cost of generic Prilosec, and artificially constricting the supply of Prilosec OTC in order to increase sales of Nexium; and (d) engaging in a unified scheme, including but not limited to the conduct alleged above, to impair generic competition to Prilosec.

136.     Defendants' actions, individually and collectively, were intended to suppress rather than to promote competition on the merits, and have achieved their intended effect.

137.     Plaintiff has been injured in its business and property by reason of Defendants' unlawful monopolization. Plaintiff's injury consists of paying higher prices for drugs containing omeprazole/esomeprazole than would have been paid in the absence of Defendants' illegal conduct. Plaintiff's injury is injury of the type that the antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

WHEREFORE, Plaintiff prays for judgment against Defendants and for the following relief:

A.     Certification of this case as a class action;

B.     Judgment declaring Defendants' conduct to be in violation of Section 2 of the Sherman Act;

C.     Judgment in Plaintiff's favor and against Defendants for damages representing three times the overcharge damages sustained by Plaintiff and the other members of the Class defined herein;

D.     That joint and several judgment be entered against each Defendants in favor of Plaintiff and the other members of the Class;

E.     Pre- and post-judgment interest;

F.     The costs of this suit, including a reasonable attorneys' fee; and

G.     Such other and further relief as the Court deems just and proper.

## **Jury Demand**

Plaintiff demands a trial by jury of all issues so triable.


Dated:  February 16, 2007                    Respectfully submitted,


_____
Michael D. Hausfeld, D.C. Bar No. 153742
Brian A. Ratner, D.C. Bar No. 473284
COHEN, MILSTEIN, HAUSFELD
   & TOLL, P.L.L.C.
1100 New York Avenue, NW
Washington, DC  20005
Tel: (202) 408-4600
Fax: (202) 408-4699


Steig D. Olson
COHEN, MILSTEIN, HAUSFELD
   & TOLL, P.L.L.C.
150 East 52nd Street, 30th Floor
New York, NY  10022
Tel: (212) 838-7797
Fax: (212) 838-7745

William A. Isaacson, D.C. Bar No. 414788
Tanya Chutkan
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW, Suite 800
Washington, DC  20015
Tel:  (202) 237-2727
Fax:  (202) 237-6131

Richard B. Drubel
Kimberly Horton Schultz
BOIES, SCHILLER & FLEXNER LLP
26 South Main Street
Hanover, NH  03755
Tel:  (603) 643-9090
Fax:  (603) 643-9010

Plaintiff demands a trial by jury of all issues so triable.

Dated:  February 16, 2007

Respectfully submitted,

Michael D. Hausfeld, D.C. Bar No. 153742
Brian A. Ratner, D.C. Bar No. 473284
COHEN, MILSTEIN, HAUSFELD
    & TOLL, P.L.L.C.
1100 New York Avenue, NW
Washington, DC  20005
Tel: (202) 408-4600
Fax: (202) 408-4699


Steig D. Olson
COHEN, MILSTEIN, HAUSFELD
    & TOLL, P.L.L.C.
150 East 52nd Street, 30th Floor
New York, NY  10022
Tel: (212) 838-7797
Fax: (212) 838-7745


William A. Isaacson, D.C. Bar No. 414788
Tanya Chutkan
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW, Suite 800
Washington, DC  20015
Tel:  (202) 237-2727
Fax:  (202) 237-6131


Richard B. Drubel, D. C. Bar No.: 334359
Kimberly Horton Schultz
BOIES, SCHILLER & FLEXNER LLP
26 South Main Street
Hanover, NH  03755
Tel:  (603) 643-9090
Fax:  (603) 643-9010

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

**I (a) PLAINTIFFS**

THE HARVARD DRUG GROUP, LLC

**DEFENDANTS**

ASTRAZENECA PHARMACEUTICALS L.P.; ASTRAZENECA L.P.; ZENECA, INC., and ZENECA HOLDINGS

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    WAYNE
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Michael D. Hausfeld
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
1100 New York Avenue, N.W. - Suite 500
Washington, D.C. 20005
(202) 408-4600

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN X IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ● 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**● A. Antitrust**

- ☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. General Civil (Other)    OR    ○ F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General** <br> ☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment** (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) <br><br> *(If pro se, select this deck)* | ☐ **895 Freedom of Information Act** <br> ☐ **890 Other Statutory Actions** (if Privacy Act) <br><br> *(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans** (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act** <br> ☐ **720 Labor/Mgmt. Relations** <br> ☐ **730 Labor/Mgmt. Reporting & Disclosure Act** <br> ☐ **740 Labor Railway Act** <br> ☐ **790 Other Labor Litigation** <br> ☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)** <br> ☐ **443 Housing/Accommodations** <br> ☐ **444 Welfare** <br> ☐ **440 Other Civil Rights** <br> ☐ **445 American w/Disabilities-Employment** <br> ☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance** <br> ☐ **120 Marine** <br> ☐ **130 Miller Act** <br> ☐ **140 Negotiable Instrument** <br> ☐ **150 Recovery of Overpayment & Enforcement of Judgment** <br> ☐ **153 Recovery of Overpayment of Veteran's Benefits** <br> ☐ **160 Stockholder's Suits** <br> ☐ **190 Other Contracts** <br> ☐ **195 Contract Product Liability** <br> ☐ **196 Franchise** | ☐ **441 Civil Rights-Voting** (if Voting Rights Act) |

**V. ORIGIN**

● 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi district Litigation ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Monopolization, 15 U.S.C., Sec. 2. Monopoly power over pharmaceutical drug products resulting in harm to purchasers

**VII. REQUESTED IN COMPLAINT** ☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____ Check YES only if demanded in complaint    **JURY DEMAND:** YES ☒ NO ☐

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☒ NO ☐ If yes, please complete related case form.

DATE _____ / SIGNATURE OF ATTORNEY OF RECORD _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.